**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANTHONY HAMMOND MURPHY,<br><br>            Plaintiff,<br><br>    v.<br><br>FINISH LINE INC., and<br>JD SPORTS FASHION PLC.,<br><br>            Defendants. | Civil Action No. 1:23-cv-64<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Anthony Hammond Murphy ("Murphy" or "Plaintiff") brings this action against Defendants Finish Line Inc., and JD Sports Fashion, Plc., ("Finish Line" or "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

## NATURE AND SUMMARY OF THE ACTION

1.     This action arises from Defendants' failure to make its digital properties accessible to blind individuals,[1] which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189. These provisions were enacted "to provide a clear and comprehensive national mandate for the

---

[1] Murphy uses the word "blind" to describe individuals who, as a result of a visual impairment, have substantially limited eyesight. This includes individuals who have no vision at all as well as people who have low vision. *See* James H. Omvig, *Why Use the Word "Blind"?*, Braille Monitor (Jan. 2009), https://nfb.org//sites/default/files/images/nfb/publications/bm/bm09/bm0901/bm090107.htm (last accessed Sept. 26, 2022).

elimination of discrimination against individuals with disabilities"[2] by "assur[ing] equality of opportunity, full participation, independent living, and economic self-sufficiency."[3]

2.      Although styled as an individual action, the injunctive relief that Murphy seeks will inure to the benefit of an estimated 2.3 percent of the United States population who report having a visual disability,[4] and to Defendants, who will extend their market reach to this population.[5]

3.      For this significant portion of Americans, accessing websites, mobile applications, and other information via their smartphones has become a necessity, not a convenience. In contrast to the largely stationary internet of the early 2000s, Americans today are increasingly connected to the world of digital information while "on the go" via smartphones.[6]

4.      Indeed, a growing share of Americans use smartphones as their primary means of online access at home. Today roughly one-in-five American adults are "smartphone-only" internet users—meaning they own a smartphone, but do not have traditional home broadband service.[7]

---

[2] 42 U.S.C. § 12101(b)(1).

[3] 42 U.S.C. § 12101(a)(7).

[4] Erickson, W., Lee, C., von Schrader, S., *Disability Statistics from the American Community Survey (ACS),* Cornell University Yang-Tan Institute (YTI), www.disabilitystatistics.org (last accessed Sept. 26, 2022).

[5] Sharron Rush, *The Business Case for Digital Accessibility,* W3C Web Accessibility Initiative (Nov. 9, 2018), https://www.w3.org/WAI/business-case/ (last accessed Sept. 26, 2022) ("The global market of people with disabilities is over 1 billion people with a spending power of more than $6 trillion. Accessibility often improves the online experience for all users.").

[6] The wide-scale adoption of this technology is staggering. According to Pew Research Center, the vast majority of Americans – 96% – now own a cellphone of some kind. And the share of Americans that own smartphones has climbed from just 35% in 2011 to 81% in 2019—amounting to more than 265 million people in the United States. *U.S and World Population Clock,* U.S. Census Bureau, https://www.census.gov/popclock/ (last accessed Sept. 26, 2022) (U.S. population on June 12, 2019 was 328.1 million).

[7] *Id.*

5.    The growth of smartphone usage is rivaled only by the myriad ways in which users can harness the capabilities of the internet for the betterment of their lives through education, employment, entertainment, commerce, and countless other pursuits.

6.    The U.S. Chamber of Commerce has documented consumers' increasing reliance on mobile platforms to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a number that's continuing to rise. The convenience, affordability and ability to compare prices with ease has led more and more customers to visit e-commerce sites before heading to a brick-and-mortar location.[8]

> New research by Leanplum found that 95% of consumers will buy at least half of their gifts online. Shoppers, especially millennials and Gen Zers, favor the convenience and the great offers and discounts associated more with shopping online than visiting a brick-and-mortar location. It's these groups that are driving e-commerce retailers to be strategic with their website design. The Leanplum survey found that 80% of respondents shop on their mobile devices.[9]

7.    The Supreme Court has even acknowledged the phrase, "'There's an app for that' has become part of the 21st-century American lexicon." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518, 203 L.Ed.2d 802, 806 (2019).

---

[8] Emily Heaslip, *A Guide to Building an Online Store,* U.S. Chamber of Commerce (Sept. 20, 2019), https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last accessed Sept. 26, 2022).

[9] Emily Heaslip, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping,* U.S. Chamber of Commerce (Jan. 6, 2020), https://www.uschamber.com/co/run/technology/building-mobile-friendly-ecommerce-websites (last accessed Sept. 26, 2022). "According to one report, e-commerce is growing 23% each year[.]" Emily Heaslip, *The Complete Guide to Selling Online,* U.S. Chamber of Commerce (Jan. 28, 2020), https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last accessed Sept. 26, 2022).

8. But "[a]s technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities."[10]

9. This is especially true with respect to accessing the internet by smartphone, where people with disabilities stand to benefit immensely if online services were fully and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard of hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.[11]

10. When digital content is properly formatted, it is universally accessible to everyone. When it's not, the content provider fails to communicate to individuals with a visual disability effectively. In turn, these individuals must expend additional time and effort to overcome communication barriers not applicable to sighted users, which may require the assistance of third parties or, in some instances, may deny outright access to the online service.[12]

---

[10] *National Disability Policy: A Progress Report,* Nat'l Council on Disability (Oct. 7, 2016), https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed Sept. 26, 2022).
[11] Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119 -AA65, Answer 57 (October 7, 2016) (citations omitted).
[12] These factors often lead disabled individuals to abandon the process of purchasing items online after they begin. Kasey Wehrum, *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It.,* Inc. Mag. (Jan. 2014), https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-

11.     Unfortunately, Murphy cannot fully and equally access Defendants' Digital Platform (defined below) because Defendants' accessibility policies and practices have made it impossible to perceive, understand, or operate the platform's content with screen reader auxiliary aids.

12.     As a result, this action for injunctive relief seeks an order requiring that Defendants (a) make its Digital Platform (defined below) accessible to Murphy and (b) adopt sufficient policies and practices, the details of which are more fully described below, to ensure the platform does not become inaccessible again in the future.

## JURISDICTION AND VENUE

13.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

14.     Defendants attempts to, and indeed do, participate in the Commonwealth's economic life by offering and providing products and services over the internet to Pennsylvania residents, including Murphy. Unlike, for example, a winery that may not be able sell and ship wine to consumers in certain states, Defendants purposefully avails themselves of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Pennsylvania residents.[13]

---

online-customers-to-complete-purchase.html (last accessed Sept. 26, 2022) (documenting the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

[13] *See Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc*., 952 F. Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum hotel operator)); *Law School Admission Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator);

15.    These online interactions between Defendants and Pennsylvania residents involve, and indeed require, Defendants' knowing and repeated transmission of computer files over the internet in Pennsylvania.

16.    Indeed, Defendants place cookies on computers and other electronic devices physically located in Pennsylvania every time a Pennsylvania resident visits the Digital Platform (defined below).

17.    Murphy was injured when he attempted to access the Digital Platform (defined below) from Erie, Pennsylvania, but encountered communication barriers that denied him full and equal access to Defendants' online products, content, and services.

18.    Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Murphy's claims occurred.

## PARTIES

19.    Murphy is a natural person over the age of 18. He resides in and is a citizen of Erie, Pennsylvania, located in Erie County.

20.    He graduated from Edinboro University with a degree in sociology in 1999 and today he works for the Commonwealth of Pennsylvania.

21.    Murphy is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*. As a result of his blindness, Murphy relies on screen access software to access digital content, like an email, a website, or an app.

---

*Access Now Inc. v. Otter Products, LLC*, 280 F. Supp. 3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc*., 298 F. Supp. 3d 296 (D. Mass. 2018) (same).

22.     Murphy has advocated for blind individuals his entire life.[14] To this end, in a class action complaint asserting claims identical to this individual action, the United States District Court for the Western District of Pennsylvania found that Murphy would fairly and adequately represent a class of "[a]ll blind or visually disabled individuals who use screen reader auxiliary aids to navigate content and who have accessed, attempted to access, or been deterred from attempting to access, or who will access, attempt to access, or be deterred from accessing the [defendants' website] from the United States." *Murphy v. Charles Tyrwhitt*, 2020 U.S. Dist. LEXIS 222540, at *9 (W.D. Pa. Nov. 25, 2020).

23.     Defendants are English corporations with a principal places of business in Indiana.

24.     Defendants are a premium retailer of athletic shoes, apparel, and accessories.

25.     In order to access, research, or purchase the products and services that Defendants offer, Murphy may visit Defendants' digital properties, located at https://www.finishline.com or https://www.jdsports.com (the "Digital Platform").

26.     Defendants own, operate, and/or control their Digital Platform and are responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

---

[14] *How did Erie plow crews do?: Your view from Facebook*, GoErie.com (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.") (last accessed Sept. 26, 2022).

## STANDING UP FOR TITLE III OF THE ADA

27.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination."[15] "It was called the '20th Century Emancipation Proclamation for all persons with disabilities.'"[16] "Title III of the ADA contained broad language covering numerous public accommodations; both new construction and existing facilities were required by the statute to remove barriers to access. The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose."[17] "However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[18]

28.     Thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA

---

[15] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (last accessed Sept. 26, 2022) (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990)).

[16] *Id.* (*quoting* D. Russell Hymas & Brett R. Parkinson, Comment, *Architectural Barriers Under the ADA: An Answer to the Judiciary's Struggle with Technical Non-Compliance*, 39 Cal. W. L. Rev. 349, 350 (2003), https://scholarlycommons.law.cwsl.edu/cgi/viewcontent.cgi?article=1166&context=cwlr (last accessed Sept. 26, 2022)); *see also* 136 Cong. Rec. 17,369 (1990) (statement of Sen. Tom Harkin) (discussing how facilities have failed to comply with the ADA by not removing barriers that impede access).

[17] Johnson, *supra* note 15 (*citing* Elizabeth Keadle Markey, Note, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002), https://ir.lawnet.fordham.edu/flr/vol71/iss1/4 (last accessed Sept. 26, 2022) (arguing for a more lenient standard for standing under the ADA)).

[18] Johnson, *supra* note 15 (*citing* Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006), https://www.uclalawreview.org/the-perversity-of-limited-civil-rights-remedies-the-case-of-abusive-ada-litigation/ (last accessed Sept. 26, 2022) (discussing the need for private enforcement in Title III of the ADA and the fact that the limitations courts are placing on ADA plaintiffs are causing abusive litigation)).

allows both the U.S. Attorney General[19] and private individuals[20] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[21]

29.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[22] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[23]

30.     DOJ supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation" for ADA compliance, "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[24]

31.     Courts recognize this dynamic too.

[Defendant] also points to the number of cases filed by the same plaintiff in this jurisdiction. Counsel have filed nine cases in this jurisdiction on behalf of [the plaintiff]. I am not impressed by this argument. If the ADA were enforced directly by the government, as are, for example, the fair housing laws, it is likely that government lawyers would have reached out to disabled individuals — "testers" as they are called — to find out which businesses were complying and which were not. [The named plaintiff] has functioned here as a "tester," which is entirely appropriate.[25]

---

[19] 42 U.S.C. § 12188(b).

[20] 42 U.S.C. § 12188(a).

[21] Johnson, *supra* note 15.

[22] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[23] *Id.* (*quoting Molski v. Evergreen Dynasty Corp*., 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

[24] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

[25] *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (Young, J.) (*quoting Iverson v. Braintree Prop. Assocs., L.P*., No. 04-cv-12079-NG, 2008 WL 552652, at *3 n.5 (D. Mass. Feb. 26, 2008) (Gertner, J.)); *see also Murphy v. Bob Cochran Motors, Inc.*, No.

32.     Consistent with the policies summarized above, Murphy now assumes the role of private attorney general to ensure Defendants communicate effectively with him and other consumers who demand full and equal screen reader access to Defendants' digital services.

## SUBSTANTIVE ALLEGATIONS

33.     The internet is a significant source of information, services, and transactions with instant and 24/7 availability and without the need to travel to attain them.

34.     Individuals who are blind access the internet and mobile applications from smartphones and/or personal computers by using keyboard controls and screen access software, which vocalizes information presented visually on a computer screen or displays that information on a user-provided refreshable braille display. Such software provides the only method by which blind individuals can independently access digital information and content. When websites and applications are not designed to allow for use with screen access software, blind individuals are unable to access the information, products, and services offered through the internet.

35.     Screen access technology has existed for decades[26] and widely-accepted standards exist to guide entities in making their websites and apps accessible to screen access software, including legal standards under Section 508 of the Rehabilitation Act. The U.S. Department of Health & Human Services maintains Best Practices for Accessible Content to ensure that accessibility is "considered throughout the [website] development process."[27] The Commonwealth

---

1:19-cv-00239, 2020 U.S. Dist. LEXIS 139887, at *15-16 (W.D. Pa. Aug. 4, 2020), *adopted by Murphy v. Bob Cochran Motors, Inc*., 2020 U.S. Dist. LEXIS 177593 (W.D. Pa., Sept. 28, 2020) (upholding tester standing in a substantially identical ADA website accessibility case).
[26] Annemarie Cooke, *A History of Accessibility at IBM,* American Found. for the Blind (Mar. 2004), https://www.afb.org/aw/5/2/14760 (last accessed Sept. 26, 2022) (Jim Thatcher created the first screen reader at IBM in 1986).
[27] *See Accessibility Basics,* U.S. Dep't of Health & Human Servs., usability.gov, https://www.usability.gov/what-and-why/accessibility.html (last accessed Sept. 26, 2022).

of Pennsylvania has maintained an Information Technology Accessibility Policy since March 16, 2006,[28] and a separate Accessibility Policy that recognizes "[a]ccessible websites ensure that as many people as possible can use internet-based information and services, regardless of disability or functional limitation."[29]

### Defendants' Inaccessible Digital Platform

36.    Defendants own, operate, developed, procured, maintain and/or use the Digital Platform for the purpose of communicating information about their products and services to consumers through computers, smartphones, and other mobile devices.

37.    Defendants are required to ensure that their Digital Platform communicates information about their products and services effectively to people with disabilities. Despite this obligation, Defendants fail to communicate this information effectively to individuals who are blind because the Digital Platform is not compatible with screen reader auxiliary aids.

38.    Two of the most commonly used screen reader auxiliary aids are JAWS from Freedom Scientific (available on Windows computers) and VoiceOver (available on macOS and iOS devices).[30]

39.    "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer

---

[28] *Information Technology Policy: Information Technology Accessibility Policy*, Pa. Office of Admin. (Mar. 16, 2006),  https://www.oa.pa.gov/Policies/Documents/itp_acc001.pdf  (last accessed Sept. 26, 2022).

[29] *Accessibility Policy*, Commonwealth of Pa.,  https://www.pa.gov/accessibility-policy/  (last accessed Sept. 26, 2022).

[30] *See Screen Reader User Survey #9 Results,* WebAIM, webaim.org, https://webaim.org/projects/screenreadersurvey9/ (last accessed Sept. 26, 2022).

applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[31]

40.     "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. VoiceOver can now describe people, objects, text, and graphs in greater detail than ever. Auditory descriptions of elements help you easily navigate your screen through a Bluetooth keyboard or simple gestures on a touchscreen or trackpad. And with unique rotor gestures that function like a dial on touchscreens and trackpads, you can make content such as websites a breeze to browse."[32]



41.     Here is an example of another online store's successful use of audio descriptions to communicate its products to screen reader users.[33] The image on the left illustrates what shoppers perceive visually when browsing the online store with an iPhone. To the right




is an image from the online store with the audio description highlighted for that image in green. Although invisible to the eye, screen access software reads this highlighted text aloud in order to describe the image to shoppers who cannot perceive content visually. In this example, when

---

[31] *JAWS®*, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed Sept. 26, 2022).
[32] *See Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed Sept. 26, 2022).
[33] *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019).

shoppers tab to the image file with a screen reader, the online store announces, "One burlap and cotton tote bag with a custom printed architectural company logo." Blind shoppers require audio descriptions, frequently called "alternative text," like this to access digital content fully, equally, and independently.

42.    Unfortunately, because of Defendants' failure to build their Digital Platform in a manner that is compatible with screen access software, including VoiceOver, Murphy is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access from his smartphone.

43.    As a result of visiting the Digital Platform, and from investigations performed on his behalf, Murphy found that Defendant fails to communicate information about their products and services effectively because screen reader auxiliary aids cannot access important content on the Digital Platform. Click the links at the end of each subparagraph to watch a short video illustrating some of the extant communication barriers on Defendants' Digital Platforms. These links, and the following examples, in no way define the entire realm of barriers rendering Defendants' Digital Platforms wholly inaccessible to individuals with visual impairments, as it would be an exhaustive undertaking to detail each and every barrier infesting Defendants' Digital Platforms, rather, the following barriers suffice to demonstrate how fundamentally they inhibit any meaningful use of Defendants' Digital Properties by Plaintiff.

**Barriers specific against Finish Line Inc.**

(a)    Defendants prevents screen reader users from accessing some primary content. Defendants presents content through the use of a slideshow. Slideshows for visual users is a great way to display the latest promotions or the latest brands a company has to offer but, when a screen reader user is trying to access the slideshow on Defendants' digital platform, they are only

told what page of the slideshow they are on but not the digital platform is unable to audio describe the content of the slideshow. This accessibility barrier prohibits the plaintiff from knowing about any current promotions or any of the latest brand offerings. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/piC_KcfG-ew?feature=share

        (b)     Defendant uses visual cues to convey content and other information when a visual user visits the digital platform. For example, when a specific shoe, or clothing size is out of stock a visual user will see that the selected sized is either "grayed out" or has a "line" through the requested size which allows visual users to infer that the selected size is unfortunately out of stock. When a screen reader user is accessing the Defendant's Digital Platform and selects the same out of stock sizes the Digital Platform is unable to audio describe that the desired size is out of stock instead, they are told that all items regardless of their availability are "Unavailable." This barrier causes screen reader users to believe that all items are out of stock though visual users are able to discern between out-of-stock items and in stock items. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/6rwhpfg0BZQ?feature=share

        (c)     Defendants use visual cues to convey content and other information. Unfortunately, screen readers cannot interpret these cues and communicate the information they represent to individuals with visual disabilities. For example, consumers who perceive content visually will notice that many products available for purchase on the Digital Platform include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. Consumers who perceive content visually will understand that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Unfortunately, screen readers cannot identify the meanings of these two fonts so that users can make an informed decision. Instead, Defendants announce two prices for

the same product, making it difficult for consumers to determine with certainty what they signify, like different quantities, conditions, sizes, or in this case, sales. This unnecessary confusion frustrates Plaintiff's ability to make informed purchasing decisions and increases the odds he will abandon the purchase process without selecting at all. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/VEOYU7XcNI4?feature=share

(d)     Defendants lack adequate alternative text for images. Consumers who perceive content visually will notice menu images that identify the brands that the Plaintiff sells but the Digital platform is unable to audio describe the images and instead the Digital Platform audio describes the image identifiers which leads screen reader users, like the Plaintiff to have to continue navigating the Digital platform to find context behind the image identification code. For example, on the Digital Platform a visual user can see that one of the menu items is for the brand "Jordan," and can see the image of a black and red "Jordan" shoe and this image alone might intrigue a visual user to click the image in order to find the specific shoe on the Digital Platform so that they may purchase it. A non-visual user though is only given the image identification code of the image and not the alternative text description of the item shown.  Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/sJzp2zUSvuE?feature=share

(e)     Defendants do not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, the Digital Platform provides a five-star rating for many products that Defendant sells. Consumers who perceive content visually can see whether a

particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant's accessibility policies fail to provide sufficiently descriptive alternative text for this important rating information. To this end, screen readers do not provide sufficient audio information when they hover over the stars on the Digital Platform. Here, the screen reader reads aloud "add to favorites," and "remove from favorites," and the number of reviews a specific product has but does not provide the correct information or context from which screen reader users may determine its significance or meaning. As a result, Plaintiff must make his purchasing decisions without the benefit of knowing whether the products he's researching are well received by other consumers. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/zH0cjRvFW-g?feature=share

(f)     Defendants have buried an Accessibility Statement in the "Order Assistance" section of the Digital Platform which is located near the bottom where screen reader users, like Plaintiff, are unlikely to discover it. To make it even harder screen reader users will have to navigate through a drop-down menu and guess the correct drop-down item in order to even find the Accessibility Statement of the Digital Platform. Imagine having to tab to the last cell in a spreadsheet but not knowing how long that would take or whether the information you seek (i.e., the Accessibility Statement) even exists. Then imagine many of the preceding cells contain unintelligible information (i.e., the access barriers described herein) you must sift through first. This pursuit frustrates screen reader users' online experience such that they are likely to abandon the process before discovering the Accessibility Statement or using the contact information it may include. Click the following link to view a short video demonstrating this access barrier: https://youtu.be/lvNl8kix4IY

**Barriers Specific to JD Sports Plc.**

(a)      Defendants have buried an Accessibility Statement in the footer of the Digital Platform, where screen reader users, like Plaintiff, are unlikely to discover it. Imagine having to tab to the last cell in a spreadsheet but not knowing how long that would take or whether the information you seek (i.e., the Accessibility Statement) even exists. Then imagine many of the preceding cells contain unintelligible information (i.e., the access barriers described herein) you must sift through first. This pursuit frustrates screen reader users' online experience such that they are likely to abandon the process before discovering the Accessibility Statement or using the contact information it may include. Click the following link to view a short video demonstrating this access barrier. https://youtu.be/78LWX-8SvRg

(b)      Defendants prevents screen reader users from accessing some primary content. Defendants presents content through the use of a slideshow. Slideshows for visual users is a great way to display the latest promotions or the latest brands a company has to offer but, when a screen reader user is trying to access the slideshow on Defendants' digital platform, they are only told what page of the slideshow they are on but not the digital platform is unable to audio describe the content of the slideshow. This accessibility barrier prohibits the plaintiff from knowing about any current promotions or any of the latest brand offerings. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/uQMla0aM1sw?feature=share

(c)      Defendants have incorrect link descriptions while navigating categories. When visual users navigate the Defendants' Digital Platform, they'll see images of "Men's Shoes," "Men's Clothing," "Women's Clothing," etc. These images also have the corresponding text links underneath that correlate with picture above. These links unfortunately do not work for visually impaired users. This is because when a visually impaired user navigates to these links the website audio describes "Shop Now, Link". These audio descriptions which are the same no matter what

link the user navigates to will leave visually impaired people like the plaintiff confused on what specific material they are navigating. This barrier is frustrating because it leaves visually impaired people such as the plaintiff to play a guessing game in order to find the correct category that they are searching for. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/dVdI_guX--Y?feature=share

(d)     Defendant uses visual cues to convey content and other information when a visual user visits the digital platform. For example, when a specific shoe, or clothing size is out of stock a visual user will see that the selected sized is either "grayed out" or has a "line" through the requested size which allows visual users to infer that the selected size is unfortunately out of stock. When a screen reader user is accessing the Defendant's Digital Platform and selects the same out of stock sizes the Digital Platform is unable to audio describe that the desired size is out of stock instead, they are told that all items regardless of their availability are "Unavailable." This barrier causes screen reader users to believe that all items are out of stock though visual users are able to discern between out-of-stock items and in stock items. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/rksqcr_OnLU?feature=share

(e)     Defendant does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, the Digital Platform provides a five-star rating for many products that Defendant sells. Consumers who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant's accessibility policies fail to provide sufficiently descriptive alternative text for this important rating information. To this end, screen readers do not

provide sufficient audio information when they hover over the stars on the Digital Platform. Here, the screen reader reads aloud "add to favorites," and "remove from favorites," and the number of reviews a specific product has but does not provide the correct information or context from which screen reader users may determine its significance or meaning. As a result, Plaintiff must make his purchasing decisions without the benefit of knowing whether the products he's researching are well received by other consumers. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/xNb0cpw3I3o?feature=share

### Plaintiff's Injury

44.    As a result of the access barriers described above, and others, Defendants fail to communicate information about its products and services to Murphy effectively, which in turn denies Murphy full and equal access to Defendants' online store and deter him from returning to the store in the future.[34]

45.    These communication barriers deter Murphy from browsing the Digital Platform.

46.    Still, Murphy intends to attempt to access the Digital Platform within the next six months to research the products, services, and content Defendant offers or to test the Digital Platform for compliance with the ADA.[35]

47.    If the Digital Platform were accessible (*i.e.* if Defendant removed the access barriers and implemented the practices described herein), Murphy could independently access Defendant's online services.

---

[34] Wehrum, *supra* note 12.
[35] *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (Young, J.) (*quoting Iverson v. Braintree Prop. Assocs., L.P.*, No. 04-cv-12079-NG, 2008 WL 552652, at *3 n.5 (D. Mass. Feb. 26, 2008) (Gertner, J.)).

**Defendant's Digital Platform Must Comply with the ADA**

48.     The ADA "as a whole is intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'"[36]

49.     Title III advances that goal by providing that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[37]

50.     DOJ regulations require that a public accommodation "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."[38]

51.     DOJ defines "auxiliary aids and services" to include "accessible electronic and information technology" or "other effective methods of making visually delivered materials available to individuals who are blind or have low vision."[39]

52.     Therefore, the ADA mandates that places of public accommodation provide auxiliary aids and services to make visual materials available to individuals who are blind.[40]

53.     Defendants are a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment."[41]

54.     The Digital Platform is a service, facility, advantage, or accommodation of Defendants.

---

[36] *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999) (*quoting* 42 U.S.C. § 12101(b)(1)).
[37] 42 U.S.C. § 12182(a).
[38] 28 C.F.R. § 36.303(c)(1); *see Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (holding that DOJ's administrative guidance on ADA compliance is entitled to deference).
[39] 28 C.F.R. § 36.303(b)(2).
[40] 28 C.F.R. § 36.303.
[41] 42 U.S.C. § 12181(7)(E), (F).

55.      As a service, facility, advantage, or accommodation of Defendants, Defendants must ensure blind patrons have full and equal access to the Digital Platform.

56.      Indeed, the ADA expressly provides that a place of public accommodation engages in unlawful discrimination if it fails to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[42]

**Defendants Received Fair Notice of its ADA Obligations**

57.      Defendants and other covered entities have had more than adequate notice of their obligation to offer individuals with disabilities an equal opportunity to access and enjoy their services and communications, including the Digital Platform.

58.      Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities,[43] and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[44]

59.      The United States Department of Justice ("DOJ") first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals.[45]

---

[42] 42 U.S.C. § 12182(b)(2)(A)(iii).
[43] 42 U.S.C. § 12182(a).
[44] 42 U.S.C. § 12182(b)(2)(A)(iii).
[45] Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996),
 https://www.justice.gov/crt/foia/file/666366/download (last accessed Sept. 26, 2022).

60.     Since then, DOJ has "repeatedly affirmed the application of [T]itle III to Web sites of public accommodations."[46]

61.     In 2000, DOJ argued to the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[47]

62.     In 2002, DOJ argued to the Eleventh Circuit that there need not be a nexus between a challenged activity and a private entity's "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off the premises.[48]

63.     In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website, www.peapod.com, is inaccessible to some individuals with disabilities, in violation of the ADA. DOJ's enforcement action against this online-only business affirms the ADA covers public accommodations that do not operate brick-and-mortar facilities open to the public.[49]

64.     In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public

---

[46] 75 Fed. Reg. 43460-01, 43464 (July 26, 2010).

[47] Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, No.        99-50891        (5th        Cir.        June        30,        2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last accessed Sept. 26, 2022) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[48] Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions,     Inc.*,     No.     01-11197,     294     F.3d     1279     (11th     Cir. 2002), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf (last accessed Sept. 26, 2022).

[49] *See* Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), https://www.justice.gov/file/163956/download (last accessed Sept. 26, 2022).

accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[50]

65.     In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III") covers websites and mobile applications and (2) the imposition of liability on businesses for not having an accessible website and mobile application does not violate the due process rights of public accommodations.[51]

66.     DOJ published "Guidance on Web Accessibility and the ADA" in 2022, reiterating once again that DOJ "has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."[52]

67.     Thus, since at least since 1996, Defendants have been on notice that their online offerings must effectively communicate with disabled consumers and facilitate "full and equal enjoyment" of the products and services it offers.[53]

## **SUBSTANTIVE VIOLATION**

---

[50] *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last accessed Sept. 26, 2022).
[51] *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019), *cert. denied* 140 S. Ct. 122 (2019) (No. 18-1539).
[52] Civil Rights Division, Department of Justice, *Guidance on Web Accessibility and the ADA* (Mar. 18, 2022), https://beta.ada.gov/resources/web-guidance/ (last accessed June 28, 2022).
[53] 42 U.S.C. § 12182(a).

**Title III of the ADA, 42 U.S.C. § 12181 *et seq*.**

68.     The assertions contained in the previous paragraphs are incorporated by reference.

69.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.[54]

70.     Defendants are bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities.[55]

71.     Murphy is legally blind and therefore an individual with a disability under the ADA.

72.     Defendants are a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment."[56]

73.     Defendants own, operate, or maintain the Digital Platform.

74.     The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendants.

75.     The Digital Platform contains communication barriers that prevent full and equal use by blind persons, including Murphy, using screen access software.

76.     Because of these communication barriers, Defendants deny Murphy full and equal enjoyment of the information, products, services, facilities, privileges, advantages, or accommodations that it makes available to the sighted public through the Digital Platform.

---

[54] 42 U.S.C. § 12182; 28 C.F.R. § 36.201.
[55] 28 C.F.R. § 36.303(c).
[56] 42 U.S.C. § 12181(7)(E), (F).

77.    These access barriers now deter Murphy from attempting to use the Digital Platform.

78.    Murphy intends to attempt to access the Digital Platform within the next six months.

79.    Defendants' discrimination is ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Murphy requests judgment as follows:

(A)    A Declaratory Judgment that at the commencement of this action Defendants were in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendants took no action that was reasonably calculated to ensure Defendants communicated the digital content of its Digital Platform to individuals with disabilities effectively such that Murphy could fully, equally, and independently access Defendants' products and services;

(B)    A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendants to take all steps necessary to communicate the content of its Digital Platform to screen reader users effectively such that Defendants' online products and services are fully, equally, and independently accessible to individuals with visual disabilities, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendants have adopted and are following an institutional policy that will in fact cause it to

remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully below:[57]

(1)    Within 90-days of the Court's Order, Defendants shall complete an accessibility audit of its Digital Platform that will examine the accessibility and usability of the Digital Platform by consumers who are blind.

(2)    Within 180-days of the Court's Order, Defendants shall develop a corrective action strategy ("Strategy") based on the audit findings. In addition to the deadlines outlined below, the Strategy shall include dates by which corrective action shall be completed.

(3)    Within 210-days of the Court's Order, Defendants shall disseminate the Strategy among its executive-level managers, employees, and contractors, if any, involved in digital development and post it on the Digital Platform.

(4)    Within 90-days of the Court's Order, Defendants shall develop a Digital Accessibility Policy Statement that demonstrates their commitment to digital accessibility to blind and other print disabled consumers, as required by the Americans with Disabilities Act. This Policy Statement shall be posted in the header of each homepage on the Digital Platform within 120-days of the Court's Order, and shall disclose that an audit is taking or has taken place and that a Strategy will be disseminated and posted on the Digital Platform within 180-days of the Court's Order.

(5)    Within 240-days of the Court's Order, Defendants shall develop procedures to implement its Digital Accessibility Policy across the entire Digital Platform. Defendants shall

---

[57] The injunctive relief herein is consistent with a 2011 settlement agreement entered into between National Federation of the Blind and The Pennsylvania State University, available at https://accessibility.psu.edu/nfbpsusettlement/ (last accessed Sept. 26, 2022); a 2014 settlement agreement between the U.S. Department of Justice and Ahold U.S.A., Inc. and Peapod, LLC, *supra* note 48; and a 2014 Resolution Agreement between the U.S. Department of Education and Youngstown State University, available at https://www2.ed.gov/documents/press-releases/youngstown-state-university-agreement.pdf (last accessed Sept. 26, 2022).

disseminate its Policy and procedures to its executive-level managers, employees, and contractors, if any, involved in digital development.

(6)    Within 12-months of the Court's Order, Defendants shall conduct training, instruction and support to ensure that all executive-level managers and employees involved in digital development are aware of and understand the Digital Accessibility Policy, including proper procedures, tools, and techniques to implement the Digital Accessibility Policy effectively and consistently.

(7)    Within 12-months of the Court's Order, Defendants shall hire or designate a staff person with responsibility and commensurate authority, to monitor the Digital Accessibility Policy and procedures.

(8)    Within 12-months of the Court's Order, Defendants shall develop and institute procedures that require third-party content and plug-ins built into the Digital Platform to provide blind consumers the same programs, benefits and services that they do to individuals without disabilities, except that when it is technically unfeasible to do so. Defendants shall effectuate these obligations by, among other things, implementing as part of its Request for Proposal process language that bidders meet the accessibility standards set forth in WCAG 2.0 Level AA for web-based technology and the Americans with Disabilities Act; requiring or encouraging, at Defendants' discretion, as part of any contract with its vendors, provisions in which the vendor warrants that any technology provided complies with these standards and any applicable current federal disability law.

(9)    Within 18-months, all pages hosted on the Digital Platform that have been published shall be Accessible to blind users. "Accessible" means fully and equally accessible to and independently usable by blind individuals so that blind consumers are able to acquire the same

information, engage in the same interactions, and enjoy the same services as sighted consumers, with substantially equivalent ease of use.

(10)    Defendants shall not release for public viewing or use a substantial addition, update, or change to the Digital Platform until it has determined through automated and user testing that those proposed additions, updates, or changes are Accessible.

(11)    Defendants shall conduct (a) an automated scan monthly and (b) end-user testing quarterly thereafter to ascertain whether any new posted content is accessible. Defendants shall notify all employees and contractors, if any, involved in digital development if corrections to the Digital Platform are needed and of reasonable timelines for corrections to be made. Defendants shall note if corrective action has been taken during the next monthly scan and quarterly end-user test.

(12)    Following the date of the Court's Order, for each new, renewed, or renegotiated contract with a vendor of Third-Party Content, Defendants shall seek a commitment from the vendor to provide content in a format that is Accessible.

(13)    Defendants shall provide Plaintiff, through his counsel, with a report on the first and second anniversaries of the Court's Order which summarize the progress Defendants are making in meeting their obligations. Additional communication will occur before and after each anniversary to address any possible delays or other obstacles encountered with the implementation of the Digital Accessibility Policy.

(C)    Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)    Payment of costs of suit;

(E)      Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR

§ 36.505, including costs of monitoring Defendant's compliance with the judgment;[58]

(F)      Whatever other relief the Court deems just, equitable and appropriate; and

(G)      An Order retaining jurisdiction over this case until Defendants have complied with

the Court's Orders.

Dated: MARCH 10, 2023                              /s/ Lawrence H. Fisher

                                                   Lawrence H. Fisher
                                                   Pa. No. 67667
                                                   One Oxford Centre
                                                   301 Grant Street, Suite 270
                                                   Pittsburgh, PA 15219
                                                   Tel. (412) 577-4040
                                                   lawfirst@lawrencefisher.com

---

[58] *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11); Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, No. 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed Sept. 26, 2022) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).